J-S59011-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MACEO EMERSON WARING, | |
| Appellant | No. 978 EDA 2015 |

Appeal from the Judgment of Sentence Entered December 16, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):
CP-51-CR-0000373-2013
CP-51-CR-0000379-2013
CP-51-CR-0000380-2013

BEFORE:  BENDER, P.J.E., OLSON, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED OCTOBER 18, 2016**

Appellant, Maceo Emerson Waring, appeals from the judgment of sentence of an aggregate term of life imprisonment without the possibility of parole, imposed after a jury convicted him of first-degree murder, carrying a firearm without a license, and two counts of aggravated assault of a police officer.  Appellant challenges the sufficiency and weight of the evidence to sustain his convictions.  After careful review, we affirm.

We begin by addressing the inadequacy of Appellant's brief to this Court.  Appellant's argument in support of his sufficiency-of-the-evidence claim, and his identical argument to support his weight-of-the-evidence

---

[*] Former Justice specially assigned to the Superior Court.

issue, each span only 1½ pages of his brief. Other than setting forth our applicable standard of review, Appellant cites no case law to support either of these issues. *See Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) ("The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities. Citations to authorities must articulate the principles for which they are cited."). Additionally, he does not specify, in his sufficiency argument, which of his three offenses he is challenging, nor identify which element(s) of those offenses the Commonwealth failed to prove.

Based on Appellant's briefing defects, we could deem both his issues waived. *See id.* at 771 ("[W]hen defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived.") (citations omitted). Rather than find waiver, however, we conclude that Appellant's scant and legally unsupported argument bolsters our determination that the detailed opinion by the Honorable Steven R. Geroff of the Court of Common Pleas of Philadelphia adequately addresses Appellant's claims. *See* Trial Court Opinion, 9/2/15, at 1-40. Thus, we adopt Judge Geroff's opinion as our own, and affirm Appellant's judgment of sentence based on the rationale set forth therein.

Judgment of sentence affirmed.

Justice Fitzgerald joins this memorandum.

Judge Olson concurs in the result.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/18/2016

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

COMMONWEALTH OF
PENNSYLVANIA

vs.

MACEO WARING

:
:

:

:
:
:
:

CP- 51-CR-000373-2013
CP- 51-CR-000379-2013
CP- 51-CR-000380-2013

SUPERIOR COURT
NO. 978 EDA 2015

**FILED**

SEP 0 2 2015

Criminal Appeals Unit
First Judicial District of PA

OPINION

CP-51-CR-0000379-2013 Comm. v. Waring, Maceo Emerson
Opinion

7340024731

GEROFF, J.

SEPTEMBER 2, 2015

On December 16, 2014, after a jury trial, the Defendant, Maceo Waring, was convicted of murder of the first degree, carrying a firearm without a license and possessing an instrument of crime;[1] he was also convicted of two counts of aggravated assault by attempting to cause serious bodily injury to law enforcement officers.[2] Also on December 16, 2014, this court sentenced the Defendant to a mandatory term of life imprisonment without the possibility of parole for the offense of murder of the first degree and imposed concurrent terms of three and one-half (3½) to seven (7) years on the charge of carrying a firearm without a license, and two and one-half (2½) to five (5) years on the charge of possessing an instrument of crime. This court also sentenced

---

[1] Bill of Information CP-51-CR-0000373-2013.
[2] Bills of Information CP-51-CR-0000373-2013; CP-51-CR-0000380-2013.

the Defendant to two consecutive terms of 10 (ten) to twenty (20) years of imprisonment on the charges of aggravated assault by attempting to cause serious bodily injury to law enforcement officers. (N.T. Volume 1, 12/16/2014, pp. 53-59, 63-64).

On December 22, Petitioner filed a post-sentence motion through his trial attorney, Bobby Hoof, Esquire. Mr. Hoof was subsequently permitted to withdraw, and on January 15, 2015, Earl G. Kauffman, Esquire, was appointed to represent the Defendant. On March 19, 2015, this court denied the Defendant's post-sentence motion.

On April 1, 2015, the Defendant filed a timely Notice of Appeal. On April 13, 2015, this court ordered counsel for the Defendant to file a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. § 1925(b). On May 6, 2015, counsel for the Defendant filed a Motion for Extension of Time to File Concise Statement of Matters Complained of on Appeal which this court granted on May 11, 2015. On June 9, 2015, counsel for the Defendant filed a Concise Statement of Matters Complained of on Appeal.

In his Statement of Matters Complained of on Appeal, the Defendant argues that the evidence was insufficient to support the verdict and that the verdict was against the weight of the evidence.

**THE EVIDENCE**

The evidence adduced at trial established beyond reasonable doubt that on September 10, 2012, the Defendant shot and killed the victim, Naeem Hameed Giles, on the 4600 block of Horrocks Street in Philadelphia. The jury also found the evidence to be sufficient to support the guilty verdict on the charges of carrying a firearm without a license and possessing an instrument

2

of crime and on two charges of aggravated assault by attempting to cause serious bodily injury to law enforcement officers.

## *The Murder and Investigation*

Police Officer Clyde Frasier testified that on September 10, 2012, he was assigned to the crime scene at 4601 Horrocks Street as a member of the Crime Scene Unit. Officer Frasier arrived at the scene at approximately 12:40 am on September 11, 2012. (N.T. Volume 1, 12/09/2014, p. 34).

Officer Frasier recalled that when he arrived at the scene, he spoke with Detective Burns (first name not given) and Detective Dove (first name not given), the assigned detectives from the Homicide Division who were already on location. The crime scene was cordoned off with police tape; the police and police vehicles were blocking off entrances and driveways in the area where the decedent's body was located. (N.T. Volume 1, 12/09/2014, p. 35).

Officer Frasier walked around the scene; he noted that the area was well lit. He then conferred with the members of his unit who were with him, Crime Scene Investigator Whitehouse (first name not given), Police Officer Lewis (first name not given), and Police Officer Perry (first name not given); he assigned tasks to each of them. They collected the physical evidence at the scene, photographed it, and sketched it to scale. (N.T. Volume 1, 12/09/2014, pp. 36-37).

Officer Frasier identified the crime scene photographs from 4601 Horrocks and Orthodox Streets and confirmed that they accurately depicted the lighting conditions that night.[3] He also

---

[3] Photograph C-1, *inter alia*, depicted the overall crime scene at the 4600 Horrocks and Orthodox Streets. (N.T. Volume 1, 12/09/2014, p. 38). Photograph C-8 depicted the middle of the highway going down Orthodox Street; it showed the ballistics (identified by the markers) and the victim lying on the sidewalk. (N.T. Volume 1, 12/09/2014, p. 41). Photograph C-11 presented a closer view west showing the location of the decedent and the markers; it also showed a jacket which was on location. (N.T. Volume 1, 12/09/2014, p. 42). Photograph C-12

3

explained that the ballistics evidence was marked by numbered placards.[4] (N.T. Volume 1, 12/09/2014, p. 44).

The ballistics evidence collected from the scene contained 10 items, including six fired cartridge casings, three fragments, and one projectile. Officer Frasier stated that all of the six recovered fired cartridge casings were .45 auto caliber. The entire ballistics evidence marked as Commonwealth Exhibit C-56 for identification was placed on Property Receipt No. 9014363. The ballistics evidence was subsequently submitted to the Firearms Identification Unit. (N.T. Volume 1, 12/09/2014, pp. 49, 50-51).

Officer Frasier stated that once he returned to the headquarters, he examined each piece of ballistics evidence with a magnifying glass with a light. He found no visible latent fingerprints on the fired cartridge casings. Officer Frasier also examined the other items collected from the scene (including the beer bottles) for any visible or identifiable prints which could be removed from those particular items. (None existed). (N.T. Volume 1, 12/09/2014, pp. 52-53).

---

showed a view east and depicted the items on the front property of 4601 Horrocks Street, a bottle and a bag of clothing and a marker showing another bottle inside a black plastic bag. (N.T. Volume 1, 12/09/2014, pp. 42-43). Photograph C-13 showed a close-up view of a 40-ounce bottle of beer in a bag located on the first step of 4601 Horrocks Street. (N.T. Volume 1, 12/09/2014, p. 43). Photograph C-14 gave a view east; it depicted a blue laundry bag filled with clothes and another 40-ounce bottle of beer and a bag. (N.T. Volume 1, 12/09/2014, p. 43). Photograph C-21 gave a close-up view of a hooded sweatshirt near the decedent. (N.T. Volume 1, 12/09/2014, p. 48).

[4] Officer Frasier explained that in contrast to the ballistics evidence, letter placards are indicative of "criminalistic stuff, like blood, clothing, and things of that nature." (N.T. Volume 1, 12/09/2014, p. 44). Photograph C-16, *inter alia*, gave a close-up view of a copper-jacketed projectile with marker #1 on the highway of Orthodox Street. Photograph C-17 showed a close-up view of a .45 auto fired cartridge casing with marker #2 on the sidewalk. (N.T. Volume 1, 12/09/2014, p. 45). Photograph C-18 gave a close-up view of multiple pieces of lead fragments on the sidewalk; Officer Frasier explained that since the lead fragments were in such close proximity to one another, he put them together and used one marker (marker # 5) for all of them. (N.T. Volume 1, 12/09/2014, p. 47). Photograph C-19 was a close-up view of a copper bullet fragment on the sidewalk. (N.T. Volume 1, 12/09/2014, p. 47). Photograph C-20 was a close-up view of a copper jacket with marker # 9. (The copper jacket was found on the highway.) (N.T. Volume 1, 12/09/2014, p. 48). Photograph C-22 was a close-up view of a .45 auto fired cartridge casing with marker #10. (N.T. Volume 1, 12/09/2014, p. 48). Officer Frasier explained that the casing was discovered underneath the decedent. *Id.*

4

Officer Frasier estimated that they were at the scene from approximately 12:40 am to 2:25 am. He did not have an opportunity to talk to any witnesses. (N.T. Volume 1, 12/09/2014, p. 55).

James Burton testified that he and the Defendant had been friends since middle school and that he had known the Defendant for about ten years or more prior to the criminal episode. Burton and the Defendant also had friends in common and they attended the same school (East Washington Rhodes Middle School) though the Defendant was in a different grade. Burton knew the Defendant's family, visited their home and ate meals with them. (N.T. Volume 1, 12/09/2014, pp. 63-64, 125).

Burton testified that he believed that in September 2012 the Defendant was living in the vicinity of 30th Street and Allegheny Avenue. The Defendant had a vehicle (a white Malibu, according to Burton); most of the times he would pick Burton up when they wanted to spend time together. The Defendant also owned a gray Monte Carlo. (N.T. Volume 1, 12/09/2014, pp. 65-66).

Burton stated that Lakeisha (also known as 'Keisha') was his close friend. In September 2012, Keisha lived at 4605 Horrocks Street with her husband and children; her uncle, Allen Young, was also staying with them. Burton stated that he would visit Keisha every day and that the Defendant accompanied him to Horrocks Street on multiple occasions. To Burton's knowledge, other than Keisha and her family, the Defendant did not know anyone on Horrocks Street. Burton also noted that Keisha's family was close with the Defendant; they considered him family. (N.T. Volume 1, 12/09/2014, pp. 67-69, 79).

Burton testified that the day of the incident the Defendant called him at his grandmother's house and told him that he would come and pick him up. They drove to Horrocks Street and

5

were riding up the block when they saw Keisha's daughters. The girls, then in their teens, jumped in the back of the car. They drove around Naples Street and returned to Horrocks Street to park the car to the left of Keisha's house, in a parking space between two parked cars. (N.T. Volume 1, 12/09/2014, pp. 70-71, 73).

Burton stated that there was a group of people "hanging out" on the corner of Horrocks Street where the Puerto Rican store was (the store was closed at that time). Burton noticed that the people (who, he said, were unfamiliar to him) were talking and drinking and were visibly enjoying themselves. (N.T. Volume 1, 12/09/2014, p. 74).

When the Defendant parked the car, everybody got out, and Keisha's children went to the corner where the rest of the people were located. Burton sat on a ledge, a "little wall" by the corner house on Orthodox Street. Burton did not recall if the Defendant also sat on that ledge. Burton did not see anyone on the other corner across the street. (N.T. Volume 1, 12/09/2014, pp. 75-76).

Burton remembered that he went into Keisha's house to say hello to her. Keisha's daughters, Aneesha, Mooka, and Courtney, and Aneesha's baby were sitting on the steps. Burton estimated that he stayed inside the house for five to ten minutes. When he came out, he noticed that Courtney, Aneesha, Mooka, and Annesha's baby were sitting in the Defendant's car which was still parked in the same spot. (N.T. Volume 1, 12/09/2014, pp. 76, 78, 126).[5]

Burton joined them there; he sat in the car for a little while and chatted with them. He then got out of the car and sat on the car trunk. As he was relaxing on the car trunk, Burton noticed that there was "some commotion going on around the corner" and heard "a little bickering, arguing." Burton stated that although he could not see the Defendant (there were

_____

[5] Burton explained that neither he nor the Defendant was romantically involved with Keisha's daughters. They looked at the Defendant as their big brother. (N.T. Volume 1, 12/09/2014, pp. 127-128).

bushes around the corner obstructing the view), he could hear him, as the car was parked not far from the corner. (N.T. Volume 1, 12/09/2014, pp. 76-77).

Burton testified that earlier that evening he saw the Defendant enter Keisha's house while Burton was standing outside at the end of the steps. He also remembered hearing the Defendant say, "Let me get my gat because I don't know these guys." Burton understood the Defendant's words to mean "Let me get my gun." (N.T. Volume 1, 12/09/2014, pp. 78-79).

Burton explained that Keisha's husband had guns in the house. The Defendant kept a gun, a Glock .45, at Keisha's house. (N.T. Volume 1, 12/09/2014, p. 79).

Burton mentioned that he did not know most of the people standing in front of the Puerto Rican store. He had seen "the little Caucasian guy" in the past, but he had never seen the victim or the "Spanish" guy, Carmelo Ortiz.[6] He also indicated that prior to that night, he would never hang out outside the Puerto Rican store when visiting Keisha. (N.T. Volume 1, 12/09/2014, p. 81).

Burton indicated that before the commotion started, he saw the Defendant on Orthodox Street, directly across from the Puerto Rican store. The Defendant was talking to his friend Tianna who was among the group of individuals standing in front of the store. Burton stated that he did not have any problem with anyone in that group and that, to his knowledge, neither did the Defendant. (N.T. Volume 1, 12/09/2014, pp. 87-90).

Burton explained that by "commotion," he meant that he heard words like "Who are you? What's up?" (Burton noted that it was the "little Caucasian guy" who uttered those words.) He also heard the Defendant say in response, "What's up?" Burton interpreted those words to be "fighting words" as he was aware that the Defendant and the "little Caucasian guy" did not know

---

[6] However, later into his testimony, Burton stated that he recognized "Naeem," the decedent. (N.T. Volume 1, 12/09/2014, pp. 82-83).

each other. Once Burton heard the words, he immediately got off the car trunk and walked around the corner (less than 10 feet, by his estimate) to see what the problem was. (N.T. Volume 1, 12/09/2014, pp. 90-91).

When Burton got around the corner, he saw "the little white guy," the victim and the Defendant; Tianna was there, too. Burton stated that he asked what was going on; the "little white guy" responded, "Your man was grilling," meaning "he's looking at me hard." At the time of this exchange, the "Puerto Rican guys" were still in front of the Puerto Rican store. (N.T. Volume 1, 12/09/2014, pp. 91-94).

Burton stated that the victim then walked up to him and said, "What's up?" meaning "[Y]ou got a problem." Burton said, "What's up?"; the victim, in turn, asked, "Do you want to mix?" Burton took those words to mean, "Do you want to fight?" Burton responded, "We can do that." The victim then turned around in a "fighting stance" and unzipped his jacket, a black hoodie. Burton stated that before the victim was able to take off his hoodie, the Defendant, who was five to six feet away from him, "[ran] past [Burton], hit [the decedent] in the back of the head with the gun, turned around, [and] shot [the decedent] twice in the chest." After the victim slid down the wall, the Defendant walked up to him and "shot him some more" as he was standing only inches away from him. When the Defendant started firing, the "little white guy," who was standing close to the decedent, ran. (N.T. Volume 1, 12/09/2014, pp. 96, 98-100, 102, 107).

Burton was not sure whether the victim was drinking that night. He only saw the "little white guy" drink; he noticed that the victim did not hold anything in his hand. (N.T. Volume 1, 12/09/2014, p. 144).

8

Burton explained that he came around to get the Defendant's back, because they were friends. He noted that he expected a fistfight, not a killing. (N.T. Volume 1, 12/09/2014, pp. 146-147).

Following the shooting, the Defendant slowly walked around the corner, and Burton followed him.[7] Burton was "nervous, shocked." (N.T. Volume 1, 12/09/2014, p. 108). He thought the Defendant was going to Keisha's house and he went to Keisha's house, too. Burton had no idea why the Defendant was going to Keisha's house until he saw the Defendant hand the gun to Keisha's uncle Allen. *Id.*

When they got to Keisha's house, Allen met them at the door and then the Defendant said, "Take this jawn."[8] (N.T. Volume 1, 12/09/2014, p. 110). Allen took the gun, and the Defendant and Burton then jumped in the car and left. *Id.*

The Defendant drove to Burton's grandmother's house. He was silent; Burton saw "the nervous look on [the Defendant's] face, like, he just did something wrong, like, out of the ordinary." (N.T. Volume 1, 12/09/2014, p. 110).

The Defendant's dropped Burton off at his grandmother's house in North Philadelphia; the car ride took no more than half an hour. Burton shared with his mother what had happened. (N.T. Volume 1, 12/09/2014, pp. 111-112).

The following day, the Defendant called Burton. He then came by and picked Burton up; they rode around Taney Street where Mooka's grandmother lived.[9] The Defendant and Mooka

---

[7] Burton later clarified – "I ain't going to say follow. We went in the same direction. I ain't run. I didn't run nowhere. I was nervous. I seen him go into Keisha house so I went to Keisha house. I was behind him, yes." (N.T. Volume 1, 12/09/2014, p. 109).

[8] By "jawn" he meant "gun." (N.T. Volume 1, 12/09/2014, p. 110).

[9] Mooka was Keisha's daughter; she was on Horrocks Street the night before. (N.T. Volume 1, 12/09/2014, p. 113).

(also known as Maurisa) talked for a while outside, on the steps of her grandmother's house, while Burton remained in the car. (N.T. Volume 1, 12/09/2014, p. 114).

When the Defendant returned to the car, he told Burton "what the situation was like, what they had." (N.T. Volume 1, 12/09/2014, p. 114). The Defendant informed Burton that the detectives had talked to Brianna and that they were calling people and asking them to come talk to them.[10] The Defendant dropped Burton off on Garnett Street; Burton had not seen him since that time. (N.T. Volume 1, 12/09/2014, pp. 113-115).

Burton recalled that two or three days after the incident, homicide detectives came to his grandmother's house. (N.T. Volume 1, 12/09/2014, p. 116). The detectives told him, "James, we know you ain't kill him but we got some questioning to do, we know you left with him." (N.T. Volume 1, 12/09/2014, p. 117). They took Burton down to the "Round House" at 8th and Race Streets and gave him the Miranda warnings. Burton decided to tell his story; he indicated that he was truthful with the detectives. After obtaining his statement, the detectives called his mother to validate what he had told them. (N.T. Volume 1, 12/09/2014, pp. 117-118).[11]

Burton also testified at the preliminary hearing on January 9, 2013. David Glanzberg, Esquire, was appointed as Burton's attorney prior to the preliminary hearing. Burton received immunity in exchange for testifying against the Defendant. Burton confirmed that everything he said in court on that day was the truth. Burton stated that although he took immunity, he was going to tell the truth regardless of having received it.

---

[10] Burton noted that he had seen Brianna at the scene at the time of the incident: she was sitting on the steps of the first house on the side of the store "talking to a gentleman." (N.T. Volume 1, 12/09/2014, pp. 114-115).

[11] Burton testified that at some point, he had learned that he was a suspect in the murder. Under cross-examination, he stated that when the detectives initially came to see him, they handcuffed him before bringing him to Homicide. While riding in the car, the detectives informed him that he was a suspect in this case. (N.T. Volume 1, 12/09/2014, p. 150-151).

Although Burton conceded on cross-examination that it was not easy to "rat out" his friend, he explained that he "wasn't trying to rat [his] friend out just because [he] had immunity." (N.T. Volume 1, 12/09/2014, p. 160). He also noted that he was truthful before anything was offered to him. On re-direct examination, Burton stated that he never asked the Defendant to get his back in this fistfight by shooting the gun. (N.T. Volume 1, 12/09/2014, pp. 160-161).

Carmelo Ortiz testified that he knew the victim, Naeem Giles (also known by his nickname "Spook") who was a friend of a friend. Ortiz estimated that he had known Giles over eight or nine months before September 2012. (N.T. Volume 2, 12/10/2014, pp. 22-23).

Ortiz testified that on September 10, 2012, at about 10:30 pm or 11:00 pm, he was in the area of Horrocks and Orthodox Streets. He was walking by the area with a couple of friends when he saw Spook and Johnny and his wife[12] and another person, Basheer, who was probably a friend of a friend. They engaged in a conversation and chatted for about half an hour to forty-five minutes in front of J's corner store. Ortiz also stated that he might have also seen two girls standing around the corner by the store.[13] (N.T. Volume 2, 12/10/2014, pp. 23-24, 25, 30).

Ortiz, Johnny, and his wife then started walking eastbound, toward the intersection of Pilling and Orthodox Streets. They decided to visit one of Ortiz's friends whom he had not seen for six or seven months. The victim, Spook, was still "hanging around" the Puerto Rican store. (N.T. Volume 2, 12/10/2014, pp. 30-32).

It was about 10:45 pm or 11:00 pm, and by the time they passed a few blocks, Ortiz felt that they were running out of time as they needed to return before 11:30 pm or 12:00 midnight, to make sure Johnny's grandmother did not lock them out of her house. Ortiz told Johnny that it

---

[12] Also referred to as Johnny's girlfriend. *See, e.g.,* N.T. Volume 2, 12/10/2014, p. 33.

[13] Ortiz believed the girls' names were Mooka and Nee Nee. He had seen them around the neighborhood; he believed they lived around the corner. (N.T. Volume 2, 12/10/2014, pp. 26-27).

11

would be best if they visited the friend another day; they walked back westbound on Orthodox Street. (N.T. Volume 2, 12/10/2014, p. 32).

Ortiz noted that Burton was probably also around Horrocks Street at that time although he did not see him on the corner when he walked by with Johnny's wife. Ortiz stated that he did not know Burton personally but that he had seen him before. Ortiz confirmed that he had identified Burton's photo when it was shown to him by the police. (N.T. Volume 2, 12/10/2014, pp. 33, 35).

Ortiz stated that Johnny and his wife crossed the street from the mini market's corner to the 1100 block of Orthodox Street. Ortiz was walking "on an angle of the street." (N.T. Volume 2, 12/10/2014, p. 35). Ortiz remembered that when he looked back, he saw that Johnny was sitting at the corner. He called Johnny twice in an effort to urge him to hurry, to no avail. When Ortiz turned around the third time, Johnny and Spook were standing at the "little retaining wall at the 1100 block of Orthodox Street." Out of the corner of his eye Ortiz could see "muzzle flashes," like a ball of fire. He then saw Johnny and Spook "diving." Ortiz did not hear any disputes or arguments immediately prior to seeing those muzzle flashes. (N.T. Volume 2, 12/10/2014, pp. 36-37).

Ortiz stated that his initial reaction was to get Johnny's wife out of the way. He "grabbed" her and ran up the alleyway. They were about 10 to 15 feet away from Spook and Johnny when Ortiz heard two or three additional gunshots. (N.T. Volume 2, 12/10/2014, p. 38).

Ortiz explained that because he was rushing, it was only after he was already halfway up the alleyway that he noticed a man in blue jeans and a dark sweatshirt standing there. Ortiz believed the man also had a hood on his head. Ortiz did not see a gun. (N.T. Volume 2, 12/10/2014, p. 39).

12

Ortiz headed toward the 1100 block of Overington Street where his aunt lived. While still in the alleyway, Ortiz called 911. He kept walking; a couple of minutes later, he saw Johnny run by him. By the time he got to the corner of Overington and Naples Streets, a police cruiser picked him up and took him to Homicide. The detectives wanted to talk to him because "[he] was the fellow that called 9-1-1." (N.T. Volume 2, 12/10/2014, p. 42).

Ortiz acknowledged the Defendant's presence in court. He also confirmed that he had seen the Defendant in the past - probably around Horrocks Street. He also stated that he had seen the Defendant with Burton once or twice. Ortiz denied seeing the Defendant personally the night of the shooting. (N.T. Volume 2, 12/10/2014, pp. 43-44).

Ortiz confirmed that he gave a statement at Homicide where he was interviewed by Detective Burns (first name not stated). He recognized the first statement he gave to the homicide detectives on September 11, 2012 into September 12, 2012. Ortiz also confirmed that during that first interview, he identified Burton's photograph on an 8-picture photo spread, circled it and put the name "James" above. Ortiz then signed his name and placed the date next to it. (N.T. Volume 2, 12/10/2014, pp. 54-56).

He also confirmed that on September 13, 2012, Detectives Burns and Keen (first name not given) met Ortiz at Large and Overington Streets. The meeting took place in an unmarked police car. During the meeting, Ortiz also confirmed that everything he said in his first statement was accurate. (N.T. Volume 2, 12/10/2014, p. 47).

Ortiz remembered that during the second meeting, the detectives showed him another array of eight photographs. He remembered identifying the Defendant on the photo array (he believed that it was photograph #7) by scribbling "Guy with James" on top of the photo.[14] Ortiz

---

[14] Ortiz was not sure if he circled the Defendant's photograph but acknowledged that the photograph did look circled. (N.T. Volume 2, 12/10/2014, p. 49).

13

recognized his signature underneath the photograph and the date, 9/13/2012. He also confirmed that when asked about the person on the photograph, he said to the detective: "That's James' friend. He was the one in the hoodie that night when Spook got killed." He also recalled telling the detectives that the Defendant was the person in the hoodie who had a gun the night of the shooting. Ortiz acknowledged putting his signature at the bottom of each page of his statement. (N.T. Volume 2, 12/10/2014, pp. 48-52, 54).

Although on cross-examination Ortiz conceded that he likely had had a shot of E & J liquor that day, he indicated that it would have been no later than around 3 pm or 4 pm. (N.T. Volume 2, 12/10/2014, p. 69).

Brianna Dockery testified that on September 10, 2012, at about 11:00 pm or 11:30 pm she was at her friend's house, on the 4600 block of Horrocks Street. After she left her friend's house, she was waiting for her stepfather to pick her up at the corner of Horrocks and Orthodox Streets, in front of J's Mini Market; however, he never showed up. Dockery had her laundry bag with her. (N.T. Volume 2, 12/10/2014, pp. 88-89, 94).

Dockery stated that her sisters Courtney, Maurisa, and Aneesha were also standing outside. She also noticed some other people outside including the decedent, a male who looked Puerto Rican, a white male, and the white male's girlfriend. Dockery testified that she also saw two black males there, "Jay and Moo" (Burton and the Defendant) whom she had known.[15] The males were standing across Horrocks Street, as was Spook, the victim. (N.T. Volume 2, 12/10/2014, pp. 89-91, 95, 97).

Dockery acknowledged the Defendant's ("Moo's") presence in the courtroom. Dockery stated that "Jay" (Burton) grew up across the street and that once in a while he would get

---

[15] Dockery stated that the Defendant was a family friend of her stepsister Maurisa. (N.T. Volume 2, 12/10/2014, pp. 109-110).

14

together with the Defendant on Horrocks Street; she sometimes saw Burton and the Defendant at Keisha's house. Dockery also stated that she knew of Allen Young and that he sometimes was at Keisha's house. (N.T. Volume 2, 12/10/2014, pp. 91, 93).

Dockery was sitting on some steps directly across the street; although there was a bush blocking Dockery's view, she was able to hear an argument involving the Defendant, Burton, and the victim and to see them from the chest up. (N.T. Volume 2, 12/10/2014, pp. 98-99, 144).

Dockery testified that following the argument, Burton hit Spook in the back of his head; the Defendant then shot Spook. Spook was shot three times. (N.T. Volume 2, 12/10/2014, p. 100).

According to Dockery, after the shooting, everyone ran away. Dockery ran up Naples Street; she left her laundry bag behind. Then she went to Ortiz's house and stood on the porch for a little while before returning to Horrocks Street to retrieve her laundry bag. She saw the police when she came back to the scene; the police asked Dockery whether the things left on the corner belonged to her. The police then took her down to Homicide. (N.T. Volume 2, 12/10/2014, pp. 101, 143).

Dockery went to Homicide and gave her first statement to Detectives Harkins (first name not given) and Burns (first name not given) in the early morning hours of September 11, 2012. She asked the detectives if she could stay overnight because she was scared and did not want to go back to the neighborhood. Dockery was allowed to stay at Homicide and was given food and a place to sleep. She ended up staying at Homicide for three days and did not return to the Horrocks Street neighborhood afterwards. Dockery noted that when she first got to Homicide, she did not tell the detectives the truth because she did not want to get in trouble (the officer told

15

her that she was going to get locked up for "harboring a fugitive" if she did not tell the truth). (N.T. Volume 2, 12/10/2014, pp. 102-104, 108, 115).

Dockery gave her second statement to Detectives Harkins and Peterman (first name not given) on September 12, 2012, at 11:15am. She acknowledged her signature on the bottom of each page of the statement. Dockery confirmed that in her statement, she stated, *inter alia*: "I didn't want to go back to the neighborhood, because I thought that everyone would think that I told on Moo and James. Besides, Moo scares me." Responding to the detectives' question, "Do you know the male that did the shooting?" she said "Yes. It was Moo." She also stated that what she said was true. (N.T. Volume 2, 12/10/2014, pp. 104, 115-116).

She remembered that the Defendant drove a white car that night because she saw her sisters get out of that car after the shooting; she also saw Burton get into that car. Dockery stated that at the time of the shooting, the Defendant's car was parked on Horrocks Street, across from Keisha's house. (N.T. Volume 2, 12/10/2014, pp. 110-111).

After the shooting, Dockery ran in the direction of Naples Street and then eastbound on Orthodox Street, past the decedent. She did not pass the Defendant or Burton as she was running; when she came back around, the Defendant's car was gone. Dockery did not know where the Defendant and Burton went. (N.T. Volume 2, 12/10/2014, pp. 112-113).

Dockery gave her third statement on September 13, 2012. On that day, the detectives came to her house and showed her a spread of eight photographs. She recognized her handwritten statement and acknowledged the authenticity of her signature at the bottom of each page; she also confirmed that she wrote down the date and the time. Dockery stated that she identified "Moo," the Defendant, on the photo array. She placed a circle around the Defendant's

16

photograph (photograph #7) on the photo spread and wrote "Moo" in the corner; she also signed and dated it at the bottom. (N.T. Volume 2, 12/10/2014, pp. 104, 116-119).

Dockery stated that she was truthful when she said to the detectives, "I know him as Moo. He's the one that shot Spook." (N.T. Volume 2, 12/10/2014, p. 120).

In her statement that day, Dockery said, *inter alia*:

> They was there for about a couple of minutes before I started hearing Moo and James and Spook start to get loud. ... That's when I seen James lean over and smack Spook in the back of the head. ... After Spook got slapped, he put his hands up to fight."

(N.T. Volume 2, 12/10/2014, p. 141).

Dockery also stated that she then observed the Defendant pull out his gun and start shooting; she heard three shots and saw the flashes of light coming from the gun. The Defendant was backing up as he was shooting. Spook and John had fallen to the ground. After the shooting, the Defendant and Burton ran around the corner to Horrocks Street and jumped into a car. (N.T. Volume 2, 12/10/2014, pp. 141-142).

Allen Young testified that at the time of the Defendant's trial, he was in custody[16] and that he received no promises with regard to the sentence he was serving in exchange for his testimony in court. He stated that he did not remember giving a statement to the detectives in this matter. He confirmed that his attorney Kadish (first name not given) explained to him that he had been given immunity with regard to this incident. (N.T. Volume 2, 12/10/2014, pp. 148-150).

Young did not recall living at 4605 Horrocks Street on September 10, 2012 when the shooting occurred. Young acknowledged that he knew Lakeisha in September 2012 but noted that he was not sure where she was living. (N.T. Volume 2, 12/10/2014, p. 152).

---

[16] Young testified that he was serving an eleven-and-a-half (11 ½) to twenty-three (23) months' sentence at CFCF on a drug charge. (N.T. Volume 2, 12/10/2014, p. 173).

Young stated that the Defendant looked familiar and that he had seen him around though he did not know him personally. He stated that he did not remember "any James Burton" and denied knowing Brianna Dockery. (N.T. Volume 2, 12/10/2014, p. 153). He denied signing a statement or the photographs. He also indicated that the paperwork he was shown in court contained someone else's name as his name was spelled differently. *Id.*

Young maintained that he did not recall using other names or aliases or giving a false name to law enforcement. However, he conceded that in October of 2014, he pleaded guilty in Delaware County to giving a false identification to a law enforcement officer. (N.T. Volume 2, 12/10/2014, pp. 154-155).

Young confirmed that he goes by the name "Allen Young" and also "Allen A. Young." He stated he did not remember being interviewed by detectives George Pirrone and Gregory Santamala at the Homicide Unit on September 14, 2012 with regard to the shooting death of Naeem Giles. He also did not remember being advised of his constitutional rights, putting his initials next to the answers or being questioned about the shooting death of Naeem Giles. Young also had no memory of putting his signature at the bottom. (N.T. Volume 2, 12/10/2014, pp. 155, 157-158, 160).

Young did not remember stating that Lakeisha Young was his niece. He denied being asked whether or not he was present when the decedent was shot and killed; he also denied saying that he was inside his niece Lakeisha Young's house when the shooting happened. (N.T. Volume 2, 12/10/2014, pp. 161, 163).

Young stated that he had no recollection of giving the detectives the following account of the circumstances surrounding the decedent's death:

I was inside Lakeisha's house. It was about 11:15 p.m. or 11:30 p.m. on the 10th [of September]. ... I was helping her in the house. I took a bucket of dirty water outside the

18

house to empty the dirty water out. When I was outside, I saw some people standing on the corner of Orthodox and Horrocks Street. One of the guys up on the corner had a hood on, but I could not tell who they were. I went back inside the house and then a couple minutes later I heard three gunshots then I heard three more. ... Then this boy James [Burton] came running inside Lakeisha's house and then a guy, Mace, followed him inside. Mace threw a gun on the couch and they ran back outside. I went to the couch and grabbed the gun. I didn't know what to do. I took the gun outside the house that night and put it in some bushes around the corner. I was off from work the next morning so I went and picked the gun up from the bushes. I didn't want some kids to find the gun so I took it to my girl's house. ... I hid the gun in her house from her. I hid it in the bedroom. I was off from work on Tuesday and Wednesday and went back to work on Thursday. Then [that] morning I got a call from my niece Lakeisha when I was working. She told me that some detectives were at her house. She told me that the detectives picked up her husband, Charles Holmes. [...] She told me that they were looking to speak to me too. I then asked her what it was about, and I asked her for the detective's number. I called the detective, but there was no answer. I tried again about a half hour later when I was on break. The detective called me back. ... I met them [at my niece's house] and brought them to my girl's house on Magee Street. I went inside and I got the gun. I took the clip from the gun and the bullet in the barrel and handed it to the detectives.

(N.T. Volume 2, 12/10/2014, pp. 163-165).

Young did not recall telling the detectives that he had known the Defendant for about two years or that he had known Burton for about ten years. Young testified that the Defendant had a familiar face but that he did not know him. He also did not recall identifying the Defendant's or Burton's photographs as well as writing "Mace" by the Defendant's photograph and "James" by Burton's photograph and putting his signature underneath. He did not recall being shown the photograph of Naeem Giles, the decedent (N.T. Volume 2, 12/10/2014, p. 165-167, 170-172).

Young had no recollection of the Defendant or Burton coming to Lakeisha's house the night of the shooting. Young also did not recall being asked if he had seen the Defendant or James since the night of the shooting and answering in the negative. (N.T. Volume 2, 12/10/2014, pp. 165, 167-168).

He also did not remember being asked why he did not call the police after the Defendant and James ran out of the house after the shooting or explaining his inaction the following way: "I

19

just wasn't thinking. I know the situation with the house. It is a Section Eight home, and I didn't want her or her home involved. I just wanted to get the gun out of there." (N.T. Volume 2, 12/10/2014, p. 169). Young also did not recall describing the gun to the detectives as a black semiautomatic or giving the gun to them. (N.T. Volume 2, 12/10/2014, p. 171).

Police Officer James Putro testified that on September 10, 2012, he was on duty at approximately 11:30 pm when he received a radio call about a shooting in the area. He and his partner, Officer Galiczynski (first name not given) were the first officers to arrive on location. (N.T. Volume 1, 12/11/2014, pp. 4-5). Upon arrival, they observed a black male on the northwest corner of Horrocks and Orthodox Streets. The male was kneeling down; his upper body was "kind of turned and his head was laying on a stone window ledge." (N.T. Volume 1, 12/11/2014, pp. 6-7).

Officers Putro and Galiczynski exited the vehicle; upon approaching the male, they saw blood on the wall and around the area. Officer Putro pulled the male's shoulders back to try to give him CPR and check his vital signs at which time he noticed that the male's "eyes were white and rolled to the top of his head." (N.T. Volume 1, 12/11/2014, p. 6). The male had multiple wounds and blood was coming from his torso. Officer Putro and his partner started securing the area with crime scene tape. The medics arrived on the scene shortly afterwards. (N.T. Volume 1, 12/11/2014, p. 7).

While on the scene, the officers talked to a few people on the block; they learned from them that the victim's name was Naeem Giles. The officers found a couple of spent shell casings and one or two projectiles on the ground around the body. The decedent had on a black hooded sweatshirt, blue jeans and black boots. (N.T. Volume 1, 12/11/2014, p. 7).

20

Officers Putro and Galiczynski located Brianna Dockery around the 4600 block of Horrocks Street, close to the corner. She appeared to be willing to speak to them. As a result of what she told them, they transported her to the Homicide Unit. (N.T. Volume 1, 12/11/2014, pp. 8-9).

Detective Gregory Santamala testified that while he was not assigned to work on this case, he and his partner, Detective Pirrone (first name not given) "were asked to interview a gentleman in relationship to this investigation." (N.T. Volume 1, 12/11/2014, p. 33). The interview took place on September 14, 2012, at about 12:00 noon, in the Homicide Unit. The person they interviewed was Allen Young. (N.T. Volume 1, 12/11/2014, pp. 32-34).

Detective Santamala testified that the interview began at 12:10 pm after the Miranda warnings were given to Young. Detective Santamala confirmed that Young was being interviewed in connection with the weapon recovery (Young was the one who gave the detectives the gun used in this case). (N.T. Volume 1, 12/11/2014, pp. 34-35).

Detective Santamala confirmed that he explained to Young that he was being questioned in connection with the shooting death of Naeem Giles. Detective Santamala stated that Young was "very cooperative and very coherent." (N.T. Volume 1, 12/11/2014, p. 38). He noted that they took a verbatim statement from Young and that the interview took about 40-45 minutes from start to finish. (N.T. Volume 1, 12/11/2014, pp. 38-39, 45).

At the request of the Prosecution, Detective Santamala read the interview questions they posed to Young as well as the answers which Young provided. *See* N.T. Volume 1, 12/11/2014, pp. 39-42.

21

In the statement, Young said, *inter alia*, that he had seen the victim walking around the neighborhood previously but that he had never spoken to him. He also stated that he was not present on the scene when Naeem Giles was shot and killed and that he was inside the home of his niece, Lakeisha Young, when the shooting happened. (N.T. Volume 1, 12/11/2014, pp. 39-40).

Detective Santamala also stated that Young mentioned in the statement that he had known the Defendant for about two years and Burton for ten years. He also confirmed that Young identified the photographs of the Defendant and Burton. (N.T. Volume 1, 12/11/2014, pp. 41-42).

Young understood that the Defendant and Burton ran into Lakeisha's house because they knew her daughters and "it was just a familiar house." (N.T. Volume 1, 12/11/2014, p. 43). Young stated that the gun that he turned over to the detectives was a black semiautomatic. *Id.*

Detective Santamala indicated that after giving the statement, Young reviewed it before signing each page without making any additions or corrections. Detective Santamala also confirmed that at the bottom of the Defendant's photograph, Young wrote, "Mace" and that he signed his name under the photograph. Young also wrote the name "James" under Burton's photograph and signed underneath; he did not sign the decedent's photograph shown to him. (N.T. Volume 1, 12/11/2014, pp. 44-45).

Detective James Burns testified that he was the assigned detective in this matter and that he was in charge of coordinating the investigation, conducting interviews, and collecting physical evidence. Detective Burns was "knocking on doors and interacting with several neighbors on the block," while his partner was supervising the crime scene. (N.T. Volume 1, 12/11/2014, pp. 50-52).

22

Detective Burns stated that he interviewed Carmelo Ortiz twice, on September 12, 2012 and on September 13, 2012. Ortiz did not appear impaired when he gave the statement on September 12, 2012. Initially, Ortiz was reluctant to talk and insisted that he had only heard the gunshots. Eventually, however, Ortiz admitted that he, in fact, was on the scene when the shooting occurred. (N.T. Volume 1, 12/11/2014, pp. 52-54, 65-68).

In his statement, Ortiz explained that he concluded that the Defendant was the shooter because there was a muzzle flash coming from his gun. Ortiz heard a total of four or five shots. Ortiz was given an opportunity to look over his statement; he confirmed to Detective Burns that the statement was accurate. (N.T. Volume 1, 12/11/2014, pp. 55-56, 58).

Detective Burns also testified that at some point the following day, on September 13, 2012, at approximately 3:40 pm, he went to the area of Large and Overington Streets to meet with Ortiz again. Their meeting took place in an unmarked police car. The purpose of the meeting was to show Ortiz a spread of photographs of eight males. Detective Burns stated that Ortiz identified the Defendant on photograph #7. Ortiz stated that the male was Burton's friend and that he was the shooter. Ortiz also confirmed that Burton, too, was on the scene that night. (N.T. Volume 1, 12/11/2014, pp. 56-59).

Based on the interviews of Carmelo Ortiz and Brianna Dockery as well as the statement taken from James Burton and other available information, Detective Burns obtained an arrest warrant for the Defendant on September 14, 2012. (N.T. Volume 1, 12/11/2014, p. 59). As is common practice, the arrest warrant was logged into the computer so that "in the event that an officer is out there and stops him ... he knows who he's stopping." (N.T. Volume 1, 12/11/2014, p. 60). Detective Burns stated that he turned the file over to the Fugitive Squad so that they could attempt to find the Defendant. *Id.*

23

Detective Burns also testified that he was privy to the interview of James Burton which was conducted by other detectives in his squad. The information provided by Burton led the detectives to Allen Young. They made an attempt to locate Young on September 14, 2012, in the residence at 4605 Horrocks Street. He was not home at the time, and they left their office telephone number for him. (N.T. Volume 1, 12/11/2014, pp. 60-61).

Young got in touch with Detective Burns a short while later and took him to a "secondary location" on Magee Street. The detectives waited outside, and Young emerged from the house shortly afterwards with the gun which he turned over to Detective Burns. The 45-caliber gun was placed on Property Receipt 3033053. Young also gave Detective Burns the clip from the gun. There were live rounds in the clip. It was at that point that Young was brought down to Homicide for a formal interview. (N.T. Volume 1, 12/11/2014, pp. 62-63).

Police Officer Brian Hollman testified that on September 28, 2012, he was doing his tour of duty with his partner, Police Officer Kochmer (first name not given). The officers were in a marked police car equipped with a Mobile Data Terminal ("MDT") system for running tags and names. (N.T. Volume 1, 12/11/2014, pp. 73-75).

Upon observing the Defendant disregard a posted stop sign at 23rd and Oxford Streets, they turned on their overhead lights and sirens and followed him. Eventually, they pulled the Defendant over before 32nd Street. The information they received from the MDT showed that the car was "valid" but that it belonged to a female not the Defendant. (N.T. Volume 1, 12/11/2014, pp. 77-79).

Officer Hollman approached the driver's side and his partner approached the passenger's side. The Defendant was the only occupant. When Officer Hollman approached the driver's side, the Defendant already had his license hanging out of the window. Officer Hollman took the

24

Defendant's license and asked him for his registration and car insurance; he informed the Defendant that he was stopped for disregarding a stop sign. (N.T. Volume 1, 12/11/2014, pp. 80-81).

Officer Hollman stated that when he received the driver's license from the Defendant, he noticed that the Defendant was physically shaking: "His hand was physically shaking hanging out the window when he gave me the information. I asked him for the rest. He gave me the driver's registration, insurance card. As we're walking back, I ... let my partner know, you know, he seemed nervous. He's shaking." (N.T. Volume 1, 12/11/2014, p. 81).

Officers Hollman and Kochmer got back in the car and ran the male's name through the MDT system. The information they received was that Maceo Waring was wanted for homicide and that he was considered armed and dangerous. Because the MDT system was "acting up" and taking time to process the information, they also ran the driver's name over the radio. After just a few seconds, the radio dispatcher asked the officers whether they had the male in custody and alerted them that the "male needs to be in custody right now." (N.T. Volume 1, 12/11/2014, pp. 81-83).

Officers Hollman and Kochmer returned to the Defendant's car. Officer Kochmer went up to the driver's side and Officer Hollman proceeded to the passenger's side with his gun out. Officer Kochmer asked the Defendant if there were any weapons inside the car; the Defendant answered in the negative. Officer Kochmer then asked the Defendant to step out, and the Defendant complied. Thereafter, Officer Kochmer patted him down for weapons; he did not discover any. (N.T. Volume 1, 12/11/2014, pp. 83-85).

Officer Kochmer instructed the Defendant to put his hands behind his back; at that point, Officer Hollman grabbed the Defendant's right arm. The Defendant started tightening his fist

25

and making it hard to place him in handcuffs. Officer Hollman requested help over the radio. After Officer Hollman got the Defendant in a headlock, he felt that the Defendant was trying to grab his gun. Officer Hollman alerted his partner, and Officer Kochmer then got behind the Defendant and started "wrestling with him." (N.T. Volume 1, 12/11/2014, pp. 87-88).

Officer Hollman remembered hearing "two loud bangs" and seeing smoke fill the car. He got out of the car and saw his partner Officer Kochmer laying on his back on the street with the Defendant holding him in "almost like a tackling motion." Officer Kochmer warned Officer Hollman that the Defendant was trying to get his gun out of its holster. (N.T. Volume 1, 12/11/2014, p. 89).

Officer Hollman stated that he feared for his life and for his partner's life. As he observed Officer Kochmer and the Defendant struggle on the ground, Officer Hollman drew his weapon, fired a shot at the Defendant, holstered his weapon back up, and grabbed the Defendant. After another unit arrived, they were able to handcuff the Defendant and place him under arrest. (N.T. Volume 1, 12/11/2014, pp. 90, 92).

As a result of this incident, Officer Hollman was injured. Though it was "nothing major," his arm "swelled up" and he had to go to Jeanes Hospital for a check-up. Officer Kochmer was bitten in his inner thigh although Officer Hollman testified that he did not know the extent of the severity of his injury. (N.T. Volume 1, 12/11/2014, pp. 92-93).

### *Expert Testimony*

<u>Testimony of Dr. Sam Gulino, an Expert in the Field of Forensic Pathology</u>

Dr. Sam Gulino, Chief Medical Examiner for the City of Philadelphia, testified as an expert in the field of forensic pathology. (N.T. Volume 2, 12/10/2014, pp. 4-5).

26

Dr. Gulino stated that he was not personally involved in the autopsy of Naeem Giles, the decedent. (The autopsy was performed by Dr. Marlon Osborne, one of the associate medical examiners who used to work for Dr. Gulino and who had since taken a job in Florida.) Dr. Gulino attested to his familiarity with this case; he reviewed the entire medical examiner case file including Dr. Osborne's autopsy report issued in this case and the photographs taken during the autopsy. (N.T. Volume 2, 12/10/2014, pp. 7-8).

Dr. Gulino confirmed that the autopsy was performed on September 11, 2012, at about 8:50 am. Dr. Gulinio explained that the decedent had sustained four gunshot wounds and a graze wound to the right shoulder; he also had a small area of abrasion on the right forearm. (N.T. Volume 2, 12/10/2014, pp. 8-9).

The first gunshot wound described by Dr. Osborne in his report was a perforating gunshot wound to the neck. The bullet went through the muscles of the neck and hit the left and right common carotid artery as well as the right internal jugular vein. The same bullet then also hit the esophagus before exiting out of the right side of the neck. (N.T. Volume 2, 12/10/2014, p. 10).

The second gunshot wound was a gunshot wound to the chest; it was associated with bleeding into the right chest cavity. The bullet, which was recovered during autopsy, fractured the right collarbone and the first and second ribs in the front part of the chest; it then went through the right lung, hit the right fifth rib in the back part of the chest and then lodged just under the skin on the right side of the back. (N.T. Volume 2, 12/10/2014, p. 11).

The third gunshot wound entered on the outer part of the left arm. The bullet went through the musculature of the arm and the shoulder and also the upper part of the back. The bullet did not enter any of the body cavities and did not hit any major organs or blood vessels.

27

The bullet recovered at autopsy lodged in the trapezius muscle on the right side. (N.T. Volume 2, 12/10/2014, p. 11).

The fourth gunshot wound was a perforating wound through the region of left elbow. The bullet traveled under the skin before exiting just above the elbow on the backside of the arm. No bullet was recovered. (N.T. Volume 2, 12/10/2014, pp. 11-12).

Finally, there was a very small (less than an inch long) wound on the outer aspect of the right shoulder. Dr. Gulino agreed with Dr. Osborne's conclusion that the bullet had just grazed across the skin without actually going in, and that it was angled upward. (N.T. Volume 2, 12/10/2014, p. 12).

Dr. Gulino concluded that the gunshot wound to the neck, which hit the blood vessels in the decedent's neck and caused bleeding, and the gunshot wound to the right collarbone region, which hit the decedent's lung and caused bleeding in his chest cavity, were both mortal wounds in combination. (N.T. Volume 2, 12/10/2014, pp. 15-16).

Based on Dr. Gulino's independent review of the records and photographs, he concluded to a reasonable degree of medical certainty, in line with Dr. Osborne's conclusion, that the victim died as a result of multiple gunshot wounds and that the manner of his death was homicide. (N.T. Volume 2, 12/10/2014, pp. 16-17).[17]

Testimony of Police Officer Kelly Walker, an Expert in the Field of Firearm Identification and Ballistics

Police Officer Kelly Walker testified as an expert in the field of firearm identification and ballistics. Officer Walker testified that she received numerous pieces of physical evidence and

---

[17] A toxicology report established that the decedent had PCP in his urine but not in his blood. He also had a trace amount of alcohol (less than a quarter of what would have been the legal limit for driving.) (N.T. Volume 1, 12/11/2014, pp. 20-22).

that she issued two separate reports in this case, the original report and an addendum to the report.[18] (N.T. Volume 1, 12/11/2014, pp. 14-16).

Officer Walker stated that she received the following items of evidence for examination: six fired cartridge casings, one bullet specimen, one bullet jacket, one bullet jacket fragment, and one pistol as well as some live ammunition and a magazine with some cartridges. All the fired cartridge casings were .45 auto caliber. Officer Walker also received a pistol - a Glock semiautomatic model 21, which was a .45 auto caliber. (N.T. Volume 1, 12/11/2014, pp. 17, 19-21).

Officer Walker did a microscopic comparison of the evidence. She noted that the six fired cartridge casings (FCCs) came from the .45 caliber automatic, P-1. (N.T. Volume 1, 12/11/2014, pp. 22, 24). [19]

Officer Walker explained that the addendum to the report dealt with the two bullets taken from the Medical Examiner's Office. Each came from the decedent's body. (N.T. Volume 1, 12/11/2014, pp. 25-26). Officer Walker concluded that both bullet specimens were also fired from P-1. (N.T. Volume 1, 12/11/2014, pp. 26, 29).

Officer Walker confirmed that all of the opinions she offered were rendered to a reasonable degree of scientific certainty. (N.T. Volume 1, 12/11/201414, p. 29).

Under cross-examination, Officer Walker conceded that the report stated, *inter alia*, "Bullet jacket one, bullet jacket fragment one, when compared against each other and P-1, insufficient corresponding microscopic markings to permit an identification." Officer Walker

---

[18] The report C-36 had an examination date of January 15, 2013; the report C-55 had an examination date of January 23, 2013. (N.T. Volume 1, 12/11/2014, p. 31).
[19] There were enough microscopic markings to determine whether or not the bullet jacket and the bullet jacket fragment had been fired from P-1. (N.T. Volume 2, 12/10/2014, p. 25).

29

admitted that theoretically that meant that bullet jacket one and bullet jacket fragment one could have come from different guns. (N.T. Volume 1, 12/11/2014, p. 30).

## *Self-Authenticating Document*

This court accepted as a self-authenticating document the Certificate of Non-Licensure signed and sealed by the commissioner of the Pennsylvania State Police, Colonel Frank Noonan, stating that Maceo Waring on the date in question, September 10, 2012, did not have a valid license to carry a firearm issued under the provisions of Section 6109 of the Crimes Code, and that he did not have a valid sportsman's firearm permit issued under the provisions of Section 6106 C of the Crimes Code. (N.T. Volume 1, 12/11/2014, pp. 48-49).

## SUFFICIENCY OF THE EVIDENCE

The Defendant claims that there is insufficient evidence to establish beyond reasonable doubt his guilt of each of the crimes for which he stands convicted. The Defendant argues that the Commonwealth did not prove its case beyond reasonable doubt.

Upon review of the record, this court finds the Defendant's claims to be meritless. This court is satisfied that the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to sustain each of the Defendant's convictions.

The standard for reviewing whether the conviction was based on sufficient evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth as verdict winner, the court is able to ascertain that there existed sufficient evidence to enable the fact-finder to find every element of the crime beyond reasonable doubt. *Commonwealth v. Lewis*, 2006 PA Super 314, ¶ 4, 911 A.2d 558, 563 (2006).

30

To sustain the conviction, the facts and circumstances relied on by the Commonwealth must show that every essential element of the crime is established beyond reasonable doubt. *Com. v. Hargrave*, 2000 PA Super 5, ¶ 7, 745 A.2d 20, 22 (2000). While guilt may never rest upon conjecture or surmise, a conviction may stand on "wholly circumstantial evidence." *Commonwealth v. Diggs*, 597 Pa. 28, 36, 949 A.2d 873, 877 (2008). *See also Commonwealth v. Roscioli*, 454 Pa. 59, 62, 309 A.2d 396, 398 (1973) ("[T]he Commonwealth does not have to establish guilt to a mathematical certainty, and may in the proper case rely wholly on circumstantial evidence....").

## First-degree Murder

The Defendant claims that the evidence was insufficient to support the guilty verdict on the charge of murder of the first degree. The Defendant's claim is without merit.

To support a conviction for first-degree murder, the Commonwealth must prove that the victim is deceased; that the Defendant killed him; and that the Defendant acted with the specific intent to kill. *Montalvo*, 986 A.2d at 92; *Commonwealth v. Pagan*, 597 Pa. 69, 83, 950 A.2d 270, 279 (2008); *Commonwealth v. Koehler*, 558 Pa. 334, 350, 737 A.2d 225, 233 (1999).

The *mens rea* required is the specific intent to kill; it is the factor which distinguishes first-degree murder from murder of a lesser grade. *Commonwealth v. Taylor*, 583 Pa. 170, 186, 876 A.2d 916, 926 (2005); *Commonwealth v. Moore*, 473 Pa. 169, 174, 373 A.2d 1101, 1104 (1977).

The Commonwealth can establish the specific intent to kill through circumstantial evidence. *Commonwealth v. Rega*, 593 Pa. 659, 681, 933 A.2d 997, 1010 (2007). The jury may infer that the use of a deadly weapon on a vital part of the human body is sufficient to establish

31

the specific intent to kill. *Commonwealth v. May*, 584 Pa. 640, 647, 887 A.2d 750, 753 (2005); *Commonwealth v. Rivera*, 565 Pa. 289, 295, 773 A.2d 131, 135 (2001); *Commonwealth v. Commander*, 436 Pa. 532, 538-39, 260 A.2d 773, 777 (1970).

Here, the cause of death was officially ruled homicide. Testimony of James Burton and Brianna Dockery directly implicated the Defendant as the killer. Each witness testified at trial that he or she saw the Defendant (whom each identified in court) shoot and kill the decedent and described the circumstances under which the killing occurred. Each witness had also given a prior statement to homicide detectives identifying the Defendant as Naeem Giles' killer; each witness had also previously identified the Defendant in a photo array as the shooter.

The evidence demonstrated that the victim's killing was premeditated and that the Defendant was conscious of his intentions. While the Defendant was not armed when he first arrived on location, he later went to Keisha's house to pick up the gun he stored there upon determining that he did not know any of "those guys" standing in front of the Puerto Rican store and that, therefore, he should get his "gat." Even though the victim was unarmed and wanted to engage in a fistfight, the Defendant pulled out his gun and fired three shots at the victim at close range following a verbal altercation. After the victim fell on the ground, the Defendant walked over to him and fired three more shots at him. As established by the expert testimony, the victim died of multiple gunshot wounds.

The killing of Naeem Giles was done with malice as evidenced by the Defendant's use of a deadly weapon on vital parts of the victim's body, including his chest and neck.

Moreover, about two and a half weeks after the murder was committed, after a routine traffic stop for ignoring a stop sign, the Defendant engaged in a struggle with Police Officers

32

Hollman and Kochmer and attempted to take each officer's service weapon thereby demonstrating his consciousness of guilt.

This court concludes that the record at trial was more than sufficient for the jury to find, beyond reasonable doubt, that the Defendant was guilty of murder of the first degree.

## Possessing an Instrument of Crime

The Defendant further argues that the evidence was insufficient to support the guilty verdict on the charge of possessing an instrument of crime. The Defendant's argument is without merit.

Under the law, a person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally. 18 Pa.C.S. § 907(a). An instrument of crime includes any item the actor used for criminal purposes and had in his possession under circumstances not manifestly appropriate for any lawful uses the item may have. *Id.* To convict of this offense, the Commonwealth must prove that the Defendant "possessed [the] gun under circumstances manifestly inappropriate for such lawful uses the gun may have had and with an intent to employ it criminally." *Commonwealth v. Jeter*, 275 Pa. Super. 89, 94, 418 A.2d 625, 628 (1980).

Here, there was sufficient evidence for the jury to find beyond reasonable doubt that the Defendant possessed an instrument of crime, a firearm, of which he had control and which he intended to use criminally. The Defendant purposely retrieved his gun from Keisha's house the night of the incident upon encountering unfamiliar people in front of the convenience store. The Defendant used the gun criminally when he fired multiple shots at the victim, Naeem Giles.

33

Furthermore, the Defendant fired the gun at close range at vital parts of the victim's body thereby demonstrating his intent to commit the crime of murder.

The Defendant was linked to the .45 auto caliber firearm, a Glock semiautomatic model 21, which was determined to be the shooting weapon in this case. The gun was given to the detectives by Allen Young, who witnessed the Defendant bring the gun to Keisha's house and leave it there after the shooting. The analysis of the ballistics evidence presented in this case demonstrated that all of the recovered fired cartridge casings were .45 auto caliber. The two bullets submitted through the Medical Examiner's Office were also linked to the same firearm.

This court is firmly of the belief that, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth as the verdict winner, there was sufficient evidence to enable the jury to find every element of possessing an instrument of crime beyond reasonable doubt.

## Firearms Not to Be Carried without a License

The Defendant also claims that the evidence was insufficient to support the guilty verdict on the firearms not to be carried without a license charge. The Defendant's argument is meritless.

18 Pa.C.S. § 6106 states, in pertinent part:

**§ 6106. Firearms not to be carried without a license**

**(a) Offense defined.--**
(1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S. § 6106 (a)(1).

34

Here, the evidence established that the Defendant carried a .45 auto caliber firearm, a Glock semiautomatic model 21, on his person at the time of the incident. The Defendant was not at his place of residence or business, and he did not have a valid and lawfully issued license for carrying the firearm. This court accepted as a self-authenticating document the Certificate of Non-Licensure which indicated that on September 10, 2012, the Defendant did not have a valid license to carry a firearm.

It follows, therefore, that there was sufficient evidence for the jury to find beyond reasonable doubt that the Defendant violated the firearms-not-to-be-carried-without-a-license statute. The Defendant's meritless claims must fail.

## Aggravated Assault – Attempt to Cause Serious Bodily Injury to Law Enforcement Officers

The Defendant also alleges that the evidence was insufficient to support the guilty verdict on the charges of aggravated assault by attempting to cause serious bodily injury to law enforcement officers. The Defendant's meritless argument fails.

18 Pa.C.S. § 2702 states, in pertinent part:

**(a) Offense defined.**--A person is guilty of aggravated assault if he:
...
(2) attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c) or to an employee of an agency, company or other entity engaged in public transportation, while in the performance of duty;
...
**(c) Officers, employees, etc., enumerated.**--The officers, agents, employees and other persons referred to in subsection (a) shall be as follows:

(1) Police officer.
...
18 Pa. C. S. § 2702 (a)(2).

35

For purposes of aggravated assault, "an 'attempt' is found where the accused, with the required specific intent, acts in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another." *Commonwealth v. Gray*, 2005 PA Super 22, ¶ 9, 867 A.2d 560, 567 (2005) (citation and quotation omitted). To support a *prima facie* case of aggravated assault on a police officer, the Commonwealth does not need to establish that the police officer actually suffered bodily injury; instead, the Commonwealth needs to establish an attempt to cause serious bodily injury, and the intent may be shown by circumstances reasonably suggesting the defendant's intent to cause such injury. *Commonwealth v. Marti*, 2001 PA Super 194, 779 A.2d 1177 (2001). *See, e.g., Commonwealth v. Lloyd*, 2008 PA Super 101, ¶ 22, 948 A.2d 875, 883 (2008) (the defendant swerved his car toward police officer's vehicle attempting to cause a head-on collision; evidence was found sufficient to demonstrate an attempt to place the officer in fear of imminent serious bodily injury while the officer was in the performance of his duty); *Commonwealth v. Stevenson*, 2006 PA Super 38, ¶ 40, 894 A.2d 759, 774 (2006) ("[T]he totality of the evidence does show that Appellant, by attempting to take hold of his handgun during the arrest struggle, took a significant and substantial step towards inflicting serious bodily injuries upon the officers."); *Commonwealth v. Marti*, 2001 PA Super 194, ¶ 10, 779 A.2d 1177, 1181 (2001) (*prima facie* case of aggravated assault established by evidence that at the time police officer was responding to domestic dispute, defendant punched him in the jaw, causing "slight swelling and pain").

Here, Officers Brian Hollman and Joseph Kochmer were performing their duties as Philadelphia police officers when the Defendant engaged in conduct which constituted a substantial step toward causing serious bodily injury to each officer. The evidence established that on September 28, 2012, after a routine traffic stop for ignoring a stop sign, the Defendant

36

engaged in a struggle with Officers Hollman and Kochmer; he placed them in fear for their lives as he attempted to take each officer's service weapon in an attempt to escape an arrest for the murder of Naeem Giles on September 10, 2012. As a result of the Defendant's actions, Officer Hollman sustained injuries which required going to the hospital for a check-up, and Officer Kochmer received a bite in his inner thigh.

The evidence showed beyond reasonable doubt that the Defendant committed an aggravated assault against the police officers and that he took a significant and substantial step toward inflicting serious bodily injuries upon the police officers.


## WEIGHT OF THE EVIDENCE

The Defendant also claims that the verdict was against the weight of the evidence. The Defendant's meritless claim fails.

The weight given to the evidence is wholly within the province of the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Hunzer*, 2005 PA Super 13, ¶ 11, 868 A.2d 498, 506-07 (2005). When reviewing the evidence adduced at trial, the court may not weigh the evidence and substitute its judgment for that of the fact-finder. *Commonwealth v. Derr*, 2004 PA Super 10, ¶ 5, 841 A.2d 558, 560 (2004). A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice, thereby making the award of a new trial imperative so that what is right and just may be given another opportunity to prevail. *Commonwealth v. Wall*, 2008 PA Super 151, ¶ 16, 953 A.2d 581, 586 (2008); *Commonwealth v. Whitney*, 511 Pa. 232, 239, 512 A.2d 1152, 1155-56 (1986). "A new trial should not be granted because of a mere

37

conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Commonwealth v. Widmer*, 560 Pa. 308, 321, 744 A.2d 745, 752 (2000). *See also Commonwealth v. Hargrave*, 2000 PA Super 5, ¶ 7, 745 A.2d 20, 22 (2000) ("[A] a mere conflict in the testimony of the witnesses does not render the evidence insufficient, for it is within the province of the fact[-]finder to determine the weight to be given to the testimony and to believe all, part, or none of the evidence.") (citations and quotations omitted).

This court finds that the Commonwealth presented sufficient evidence to uphold the Defendant's convictions and that the convictions in the present case were not against the greater weight of the evidence.

Here, the jury was aware that on earlier occasion, Carmelo Ortiz made statements to homicide detectives which in some respects were inconsistent with the testimony this witness gave at trial. The jury chose to regard this evidence as proof of the truth of what Ortiz said in the earlier statement.

The jury was also informed that at the time of the Defendant's trial, Allen Young was serving a sentence of eleven and a half (11 ½) to twenty-three (23) months for a drug offense and that he testified as a prisoner brought to court for the purpose of offering testimony. Although the jury was aware that Young did not receive any promises of assistance from the Commonwealth on that case, the jury was notified that prior to being called to the witness stand, Young was given immunity with regard to any criminal involvement in hiding the Defendant's firearm. This court instructed the jury that it could have considered this evidence in deciding what part, if any, of Young's trial testimony the jury could believe as compared to his earlier statement to Detective Santamala given on September 14, 2012, and the jury chose to regard the

38

evidence relating to that statement as proof of the truth of what Young said to Detective Santamala.

Similarly, the jury was also aware that James Burton testified under a grant of immunity. The jury was also on notice that it had to decide whether James Burton was an accomplice in the homicide charged in this case. This court instructed the jury on accomplice liability explaining to the jury that an accomplice's testimony has to be assessed by special cautionary rules as he may try to testify falsely in the hope of obtaining favorable treatment, but that, on the other hand, an accomplice may be a perfectly truthful witness.

This court also instructed the jury that it could decide on the credibility, weight and effect of the evidence pertaining to the Defendant's struggle with police officers as he attempted to resist an arrest. It was up to the jury to decide whether this conduct also tended to show that the Defendant was conscious of his guilt.

In addition, the jury was aware that it was charged with determining the credibility and weight of expert testimony taking into consideration, *inter alia*, each expert's training, education, experience and ability as well as the factual information on which he or she based each opinion, the source and reliability of that information, and the reasonableness of any explanation each expert gave to support his or her opinions.

Upon review of the challenge to the weight of the evidence, this court concludes that the verdict was consistent with the evidence. The jury – the sole judges of the credibility and weight of all of the testimony - was free to believe all, part or none of the evidence, and it clearly found the evidence to be credible and reliable.

We conclude, therefore, that the jury verdict did not shock any sense of justice. No relief is due.

39

## CONCLUSION

In summary, this court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Defendant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

BY THE COURT:

STEVEN R. GEROFF, J.